**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WELLS FARGO BANK N.A.; WELLS
FARGO HOME MORTGAGE,
        *Plaintiffs-Appellees,*

v.

DEMETRIOS A. BOUTRIS,
        *Defendant-Appellant.*

No. 03-16194

D.C. No.
CV-03-00157-
GEB(JFM)

NATIONAL CITY BANK OF INDIANA;
NATIONAL CITY MORTGAGE CO.,
        *Plaintiffs-Appellees,*

v.

DEMETRIOS A. BOUTRIS,
        *Defendant-Appellant.*

No. 03-16461

D.C. No.
CV-03-00655-
GEB/JFM

WELLS FARGO BANK N.A.; WELLS
FARGO HOME MORTGAGE,
        *Plaintiffs-Appellants,*

v.

DEMETRIOS A. BOUTRIS,
        *Defendant-Appellee.*

No. 03-16197

D.C. No.
CV-03-00157-
GEB(JFM)

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
November 4, 2004—San Francisco, California

10455

Filed August 12, 2005

Before: Stephen Reinhardt, Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Virginia Jo Dunlap, Deputy Commissioner, Alan S. Weinger, Supervising Counsel, Judy L. Hartley, Senior Corporations Counsel, Kimberly L. Gauthier, Corporations Counsel, and Douglas M. Gooding, Corporations Counsel, California Department of Corporations, Los Angeles, California, for the defendant-appellant/cross-appellee.

William L. Stern, Severson & Werson, San Francisco, California, and E. Edward Bruce, Stuart C. Stock, Robert A. Long, Jr., and Keith A. Noreika, Covington & Burling, Washington, D.C., for the plaintiffs-appellees/cross-appellants.

Julie L. Williams, Acting Comptroller, Daniel P. Stipano, Acting Chief Counsel, L. Robert Griffin, Deputy Chief Coun-

sel, and Horace G. Sneed, Director of Litigation, U.S. Department of the Treasury, Office of the Comptroller of the Currency, Washington, D.C., for amicus curiae Office of the Comptroller of the Currency.

Edward P. Sangster and Dylan B. Carp, Kirkpatrick & Lockhart LLP, San Francisco, California, for amicus curiae Quicken Loans Inc.

## OPINION

BERZON, Circuit Judge:

In these cross-appeals concerning California's regulation of residential mortgage lenders, we decide two issues: *First*, does the National Bank Act ("Bank Act"), 12 U.S.C. §§ 21 *et seq.*, preempt the California Commissioner of Corporations' ("the Commissioner") exercise of investigative and licensing authority over "operating subsidiaries" of national banks? *Second*, does section 501 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), 12 U.S.C. § 1735f-7a, preempt California's per diem loan-interest statute?

The district court answered both questions in the affirmative. *Wells Fargo Bank, N.A. v. Boutris*, 265 F. Supp. 2d 1162 (E.D. Cal. 2003) (*Wells Fargo II*).[1] For the reasons that follow, we affirm the district court's conclusion as to preemption under the Bank Act but hold that the per diem loan-interest statute is not preempted by the DIDMCA.

---

[1] We refer to the final judgment of the district court as "*Wells Fargo II*" to distinguish it from that court's earlier ruling granting in part and denying in part Wells Fargo's motion for a preliminary injunction. *See Wells Fargo Bank, N.A. v. Boutris*, 252 F. Supp. 2d 1065 (E.D. Cal. 2003) (*Wells Fargo I*).

## I.  Background

These appeals arise out of California's attempts to require Wells Fargo Home Mortgage Inc. (WFHMI) and National City Mortgage Co. (NCMC), wholly owned subsidiaries of Wells Fargo National Bank and National City Bank of Indiana, respectively, to conduct audits of their residential mortgages. The purpose of the audits was to ascertain whether the mortgage subsidiaries had overcharged interest and provided unduly low estimates of certain classes of settlement fees, in violation of California law.[2] From 1996 to 2003,[3] WFHMI was licensed to engage in real estate lending activities under the California Residential Mortgage Lending Act (CRMLA), CAL. FIN. CODE §§ 50000 *et seq*.,[4] and the California Finance Lenders Law (CFLL), CAL. FIN. CODE §§ 22000 *et seq.*[5] The

---

[2]Wells Fargo has advised this court that WFHMI recently merged back into Wells Fargo National Bank and so no longer exists as an independent entity. Because this lawsuit seeks injunctive and declaratory relief regarding an audit relating to the period before the merger, Wells Fargo's claims as to WFHMI are not moot. Further, even if they were, the legal issues presented before would still be before us, as NCMC remains an operating subsidiary of National City Bank of Indiana.

[3]For clarity, we recite the facts only as they pertain to Wells Fargo and WFHMI. There is no distinction between WFHMI and NCMC pertinent to our disposition.

[4]Specifically, the CRMLA provides that:

> No person shall engage in the business of making residential mortgage loans or servicing residential mortgage loans, in this state, without first obtaining a license from the commissioner in accordance with the requirements of Chapter 2 (commencing with Section 50120) or Chapter 3 (commencing with Section 50130), and any rules promulgated by the commissioner under this law, unless a person or transaction is excepted from a definition or exempt from licensure by a provision of this law or a rule of the commissioner.

CAL. FIN. CODE § 50002(a). The licensing requirements referred to in the section are discussed in more detail below.

[5]The CFLL does not apply to any loans made pursuant to the CRMLA. *See* CAL. FIN. CODE § 22060.

Commissioner is the state official charged with enforcing those laws governing licensed home-mortgage lenders, including a statute barring lenders from charging interest during certain periods. CAL. FIN. CODE § 50204(*o*); *see Wells Fargo II*, 265 F. Supp. 2d at 1164.

To that end, the Commissioner routinely conducts regulatory examinations of licensees' records. The facts giving rise to this suit began after one such examination, when

> the Commissioner demanded that WFHMI conduct an audit of its residential mortgage loans made in California during 2001 and 2002. The purpose of the audit was to identify all loans where WFHMI charged per diem interest in violation of California Financial Code § 50204(*o*), so that WFHMI could make appropriate refunds, and identify instances of understating finance charges in violation of the federal Truth in Lending Act. WFHMI objected to the Commissioner's request in a letter dated January 22, 2003, in which it asserted because it is an operating subsidiary of a national bank it is subject to the OCC's exclusive regulatory authority.

*Id.* (citations omitted).

Five days after sending its objection letter to the Commissioner, Wells Fargo filed this suit in the U.S. District Court for the Eastern District of California, seeking declaratory and injunctive relief. Wells Fargo's position throughout this litigation has been that the Commissioner cannot require an audit because the relevant provisions of California law from which any such authority derives are preempted by federal laws and regulations — specifically, by the Bank Act, the DIDMCA, and the regulations promulgated by the Office of the Comp-

troller of the Currency thereunder, 12 C.F.R. §§ 5.1 *et seq.* (2005).[6]

On February 4, 2003, eight days after Wells Fargo filed this suit, the Commissioner instituted administrative proceedings against WFHMI to revoke its California licenses. Wells Fargo sought a preliminary injunction, both to bar the administrative proceedings and to enjoin the Commissioner from continuing to exercise "visitorial" authority over WFHMI.[7] The district court rejected the injunction application as to the revocation proceedings, but granted the preliminary injunction as to the visitorial authority issue.[8]

---

[6]The agency, to which we interchangeably refer as the "OCC" or "Comptroller," has appeared in this case as amicus curiae. We acknowledge their helpful participation in clarifying a complex statutory scheme.

[7]As the district court observed, "visitorial power[ ] . . . generally refers to the power of the OCC to 'visit' a national bank to examine its activities and its observance of applicable laws, and encompasses any examination of a national bank's records relative to the conduct of its banking business as well as any enforcement action that may be undertaken for violations of law." *Wells Fargo II*, 265 F. Supp. 2d at 1165 n.5 (internal quotation marks omitted).

For a helpful early overview of visitorial authority under the Bank Act, see *First National Bank of Youngstown v. Hughes*, 6 F. 737, 740-42 (C.C.N.D. Ohio 1881), *appeal dismissed*, 106 U.S. 523 (1883). *See also First Union Nat'l Bank v. Burke*, 48 F. Supp. 2d 132, 137-38 (D. Conn. 1999); *Peoples Bank of Danville v. Williams*, 449 F. Supp. 254, 258-59 (W.D. Va. 1978). On the common-law understanding of visitorial power, see *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 673-76 (1819) (Story, J., concurring); and *Allen v. McKean*, 1 F. Cas. 489, 497-98 (C.C.D. Me. 1833) (No. 229) (Story, Circuit Justice).

[8]In granting the preliminary injunction in part and denying it in part, the district court ruled that "the Commissioner is preliminarily enjoined from exercising visitorial powers over Plaintiffs or from otherwise preventing WFHMI from operating in California; however, the portion of Plaintiffs' motion seeking to preliminarily enjoin the Commissioner from revoking WFHMI's California issued licenses is denied." *Wells Fargo I*, 252 F. Supp. 2d at 1074. The court refused to enjoin the license revocation because "[i]t would be ironic for an injunction to issue in such circumstances since WFHMI could have avoided the harm it contends it will suffer had it chosen to comply with the requirements of the California licenses it possesses." *Id.* (internal quotation marks omitted).

The parties then cross-moved for summary judgment. The district court granted Wells Fargo's motion for summary judgment on the preemption claims and the Commissioner's motion for summary judgment on the retaliation claim. The court also entered a permanent injunction against the Commissioner, barring him from "exercising visitorial powers over Plaintiffs and from enforcing California Financial Code § 50204(*o*) and California Civil Code § 2948.5 against Plaintiffs." *Wells Fargo II*, 265 F. Supp. 2d at 1179. These appeals followed.

## II.   Bank Act Preemption

As we observed three years ago:

> Congress has legislated in the field of banking from the days of *M'Culloch v. Maryland*, creating an extensive federal statutory and regulatory scheme. The history of national banking legislation has been "one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law."

*Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996)) (citation omitted).

In light of this history, we held in *Bank of America* that the usual presumption against federal preemption of state law is inapplicable to federal banking regulation. *See* 309 F.3d at 558-59. Thus, "[i]n defining the pre-emptive scope of statutes and regulations granting a power to national banks, [the Supreme Court's jurisprudence] take[s] the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Barnett Bank*, 517 U.S. at 33. As shall become

apparent, our analysis draws on these animating principles of federal primacy and exclusivity in the field of banking regulation. *Cf. Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003) (recognizing "the special nature of federally chartered banks").

## A.  Operating Subsidiaries and the Bank Act

**[1]** At the core of these appeals is 12 C.F.R. § 7.4006, a regulation promulgated by the OCC in 2001, which states: "Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." *See* Investment Securities; Bank Activities and Operations; Leasing, 66 Fed. Reg. 34,784, 34,788-89 (July 2, 2001). Section 7.4006 does not define "operating subsidiary." Instead, the term is defined, indirectly, in both the Bank Act and OCC regulations, as a subsidiary that "engages solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks." 12 U.S.C. § 24a(g)(3)(A); *see also* 12 C.F.R. § 5.39(d)(6)(i).[9] The federal banking statutes do not otherwise mention operating subsidiaries.

---

[9]The definition is indirect because it is contained within the exceptions to the definition of "financial subsidiary" in 12 U.S.C. § 24a(g)(3) and 12 C.F.R. § 5.39(d). A financial subsidiary, by contrast, is "any company that is controlled by 1 or more insured depository institutions other than a[n operating] subsidiary [or a subsidiary that] . . . a national bank is specifically authorized by the express terms of a Federal statute (other than this section), and not by implication or interpretation, to control . . . ." 12 U.S.C. § 24a(g)(3).

In the original version of current 12 C.F.R. § 5.34, the comprehensive rule governing "operating subsidiaries" to which we return shortly, an operating subsidiary was defined as "a corporation the functions or activities of which are limited to one or several of the functions or activities that a national bank is authorized to carry on." Acquisition of Controlling Stock Interest in Subsidiary Operations Corporation, 31 Fed. Reg. 11,459, 11,459 (Aug. 31, 1966) (formerly codified at 12 C.F.R. § 7.10) [hereinafter "Operating Subsidiary Rule"]. The current regulation, codified at § 5.34, contains no such definition.

The Commissioner's central contention is that this regulation is beyond the scope of the OCC's delegated authority. More specifically, the Commissioner maintains that because operating subsidiaries are not, themselves, "national banks," they are therefore not subject to *exclusively* federal regulation to the same extent as are national banks. His argument therefore challenges the propriety of the regulation, raising a question of first impression in this circuit.[10] Although posed in the singular, the question whether the OCC may preempt contrary state law as applied to operating subsidiaries of national banks depends, in our view, on the answer to two logically prior questions: First, we must resolve whether the OCC regulation allowing national banks to create and operate subsidiaries that perform national bank functions is consistent with the Bank Act. Second, we need to consider whether the OCC may regulate such entities. Only after answering these first two questions can we decide whether the OCC may regulate such entities to the exclusion of the states in the two areas pertinent here — visitorial authority and licensing requirements.

One final point bears mention at the outset: Because the parties' arguments turn almost entirely on the OCC's interpretation of the Bank Act, a necessary threshold question to our analysis here is whether, and to what extent, the OCC's implementation of the Act, as manifested in § 7.4006, is entitled to deference.

---

[10]Besides the district court in this case, the other courts that have ruled on this specific issue (which appears to have been litigated only since the promulgation of 12 C.F.R. § 7.4006 in July 2001) are the Second Circuit, *see Wachovia Bank, N.A. v. Burke*, No. 04-3770-CV, 2005 WL 1607740 (2d Cir. July 11, 2005), and the U.S. District Courts for the District of Maryland, *see Nat'l City Bank of Ind. v. Turnbaugh*, 367 F. Supp. 2d 805 (D. Md. 2005), and the Western District of Michigan, *see Wachovia Bank, N.A. v. Watters*, 334 F. Supp. 2d 957 (W.D. Mich. 2004), *appeal docketed*, No. 04-2257 (6th Cir. Oct. 14, 2004). Each of the other courts held, as did the district court here and as do we, that the Bank Act preempts the relevant state laws.

**[2]** The OCC is the agency "charged with supervision of the National Bank Act." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995). Its rulemaking authority is codified at 12 U.S.C. § 93a, which provides:

> Except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to another regulatory agency, the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office, except that the authority conferred by this section does not apply to section 36 of this title [the McFadden Act] or to securities activities of National Banks under the Act commonly known as the "Glass-Steagall Act".

As the definition makes clear, this conferral of regulatory authority is as broad as the OCC's statutory responsibilities, defined piecemeal throughout the Bank Act. *See, e.g.*, 12 U.S.C. §§ 25a(e), 26, 29, 71, 84(d), 92, 92a(a), 93(d), 211(a), 371, 481, 633(b); *see also Conference of State Bank Supervisors v. Conover*, 710 F.2d 878, 883 (D.C. Cir. 1983) (per curiam).[11]

**[3]** Given this rulemaking authority, the OCC's interpretation of ambiguous language in the Bank Act is entitled to deference under the two-step framework of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984):

> Under the familiar two-step analysis in *Chevron*, if Congress has "directly spoken to the precise ques-

---

[11]The Supreme Court has affirmed that the OCC is the agency generally responsible for the administration of the Bank Act, citing 12 U.S.C. §§ 1, 26-27, and 481 in support of that conclusion. *See NationsBank*, 513 U.S. at 256; *see also Inv. Co. Inst. v. Camp*, 401 U.S. 617, 626-27 (1971) (citing *First Nat'l Bank v. Missouri*, 263 U.S. 640, 658 (1924)).

tion at issue," then the matter is capable of but one interpretation by which the court and the agency must abide. By contrast, where we determine that a statute is not clear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*Vigil v. Leavitt*, 381 F.3d 826, 834 (9th Cir. 2004) (quoting *Chevron*, 467 U.S. at 842-43). As the statutory interpretation issues we must address to determine the validity of § 7.4006 devolve into separate questions, as we have explained, the relevant authority for each inquiry has separate statutory sources, and the *Chevron* inquiry is necessarily step-by-step. We therefore proceed to analyze the validity of § 7.4006 — and the appropriate deference, if any, to accord to the OCC's relevant interpretations — incrementally.

## B.   The OCC's Authority To Allow National Banks To Operate Through Operating Subsidiaries

As noted, the Bank Act is silent regarding "operating subsidiaries."[12] Congress has thus not addressed, except indirectly, whether banks may organize and delegate banking functions to such entities in the first place.

---

[12]The Commissioner argues that Congress's silence in the Bank Act regarding operating subsidiaries resolves step one of the *Chevron* inquiry in his favor. The district court in *Wachovia Bank, N.A. v. Burke* explained why this *expressio unius* argument must fail: "While this silence might have been significant to the court were it to interpret the statute *de novo*, it does not answer the question asked by the first step of *Chevron* — namely, whether Congress has 'unambiguously expressed [its] intent.' " 319 F. Supp. 2d 275, 285 n.5 (D. Conn. 2004) (quoting *Chevron*, 467 U.S. at 843) (alteration in original), *aff'd in part, rev'd and vacated in part on other grounds*, No. 04-3770-CV, 2005 WL 1607740 (2d Cir. July 11, 2005). We agree. The absence of any reference to operating subsidiaries in the Bank Act does not unambiguously provide that national banks may not create and perform banking functions through such entities.

**[4]** The Bank Act, however, does bestow upon national banks the authority "[t]o exercise by its board of directors or duly authorized officers or agents, subject to law, all such *incidental* powers as shall be necessary to carry on the *business of banking*; . . . ." 12 U.S.C. § 24(Seventh) (emphasis added). This "incidental powers" provision is central to our analysis here, as it is the basis for the OCC's permission to national banks to create and operate banking functions, through subsidiaries.

Because § 24(Seventh) is not explicit on the limits of "incidental powers," the OCC is entitled to *Chevron* step-two deference as to whether the Bank Act supports the creation of operating subsidiaries pursuant to that provision. *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 640 (D.C. Cir. 2000) (holding that the "incidental powers" provision permits "the Comptroller [to] authorize additional activities if encompassed by a reasonable interpretation of § 24(Seventh)"). Our inquiry, then, is whether the agency interpretation allowing operating subsidiaries as an exercise of "incidental powers" is reasonable. *See, e.g.*, *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 357 F.3d 1012, 1015 (9th Cir. 2004) (citing *Barnhart v. Walton*, 535 U.S. 212, 217-18 (2002)). We hold that it is.

The Supreme Court has approved the OCC's interpretation of the "incidental powers" provision as permitting a range of bank authority beyond that specified in the statute. As the Court has noted, because "the 'business of banking' is not limited to the enumerated powers[13] in § 24 Seventh . . . the Comptroller therefore has discretion to authorize activities

---

[13]Section 24(Seventh) mentions some of the banks' powers, including "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt," "receiving deposits," "buying and selling exchange, coin, and bullion," "loaning money on personal security," and "obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes [the Bank Act]."

beyond those specifically enumerated." *NationsBank*, 513 U.S. at 258 n.2; *see also Bank of Am.*, 309 F.3d at 562. At the same time, "[t]he exercise of the Comptroller's discretion, however, must be kept within reasonable bounds. Ventures distant from dealing in financial investment instruments — for example, operating a general travel agency — may exceed those bounds." *NationsBank*, 512 U.S. at 258 n.2.[14]

**[5]** We have endorsed the approach adopted by the First Circuit in *Arnold Tours, Inc. v. Camp*, 472 F.2d 427 (1st Cir. 1972), for delineating the scope of "incidental powers" under § 24(Seventh):

> [A] national bank's activity is authorized as an incidental power, "necessary to carry on the business of banking," within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power.

*Id*. at 432, *quoted in M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977); *see also Nat'l Retailers Corp. of Ariz. v. Valley Nat'l Bank of Ariz.*, 604 F.2d 32, 33 (9th Cir. 1979) (per curiam) (discussing our adoption of *Arnold Tours* in *M & M Leasing*). Applying this standard, we agree with the district court that the Comptroller had the authority under § 24(Seventh) to permit banks to delegate some of their banking functions to operating subsidiaries.

---

[14]Congress, not the OCC, has explicitly authorized national banks to engage in real estate lending. *See* 12 U.S.C. § 371(a). The Commissioner's argument, at various points in his briefs, that the regulation of real estate lending falls outside the substantive scope of the OCC's delegated authority is therefore unavailing.

Allowing national banks to create, control, and delegate banking functions to operating subsidiaries provides some assistance to banks in performing their authorized activities. Indeed, the stated considerations motivating the initial adoption of the operating subsidiary rule in 1966 were that developing such subsidiaries would aid banks in "controlling operations costs, improving effectiveness of supervision, [providing for] more accurate determination of profits, decentralizing management decisions[,] or separating particular operations of the bank from other operations." Operating Subsidiary Rule, 31 Fed. Reg. at 11,460. At the same time, permitting operating subsidiaries does not expand the functions carried out by the banks. The determination whether to conduct business through operating subsidiaries or, instead, through subdivisions of the bank itself is thus essentially one of internal organization, so long as the operating subsidiary form of organization cannot be used to evade the rules that apply to national banks. Under 12 C.F.R. § 5.34, the rule governing operating subsidiaries, such evasion is not permitted. *See* 12 C.F.R. § 5.34(e)(1) (providing that "[a] national bank may conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking, as determined by the OCC, or otherwise under other statutory authority"); *id.* § 5.34(e)(3) ("An operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank.").

**[6]** Allowing national banks to conduct business through operating subsidiaries is therefore a permissible construction of those banks' incidental powers under the Bank Act. We hold that the OCC's interpretation of 12 U.S.C. § 24(Seventh) as authorizing it to allow national banks to conduct business through operating subsidiaries is a permissible one.

### C. The OCC's Authority To Regulate Operating Subsidiaries

That the Bank Act may be construed as allowing private national banks to conduct business through operating subsidiaries does not, however, necessarily resolve whether the Act also delegates to the OCC the authority to regulate such entities. That is to say, § 24(Seventh) concerns the incidental powers of national banks, not the extent of the OCC's regulatory authority. Determining the reach of that authority is a separate question, involving the interpretation of 12 U.S.C. § 93a.

Section 93a, like the rest of the Bank Act, is silent as to the OCC's authority to regulate operating subsidiaries. This court has recognized, however, that the OCC's authority to interpret the reach of the "incidental powers" conferred by § 24(Seventh) necessarily includes the authority to regulate the exercise of those powers to assure that they remain "incidental" to the "business of banking."

We so held in *M & M Leasing*, in which the central question was whether the leasing of automobiles by national banks was within the "incidental powers" of such banks, as the Comptroller had determined. After determining that, within limits, it is, we made clear that the Comptroller has both the authority and the "duty" "to promulgate reasonably detailed regulations which will confine leasing within the channels of the 'business of banking.' " 563 F.2d at 1384. *M & M Leasing*'s conclusion that "[p]reparation of a comprehensive charter [for the exercise of "incidental powers"] is a function that belongs to the Comptroller," *id.*, necessarily makes the promulgation of such regulations one of the "responsibilities of the office" contemplated by § 93a, as to which the Commissioner has rulemaking power.

[7] *M & M Leasing*'s logic applies here. Just as the Comptroller's authority to regulate national banks' leasing activities

is inherent in his authority to interpret the "incidental powers" provision to allow such leasing in the first place, his authority to regulate operating subsidiaries also follows from the OCC's authority to allow such entities.

Further, the OCC operating subsidiary regulations most pertinent to the present inquiry quite directly address the reach of the national banks' "incidental powers" authority to create and conduct their business through such entities. Those regulations, quoted above, restrict the range of activities that operating subsidiaries may conduct to those in which their parent banks may engage, *see* 12 C.F.R. §§ 5.34(e), 5.39(d)(6)(i), and state that such subsidiaries are subject to the same federal rules and standards "that apply to the conduct of such activities by its parent national bank." *Id.* § 5.34(e)(3). These provisions ensure that the decision to conduct banking activities through subsidiaries neither expands the national banks' scope of activities nor undermines the authority of the OCC to regulate those activities. By establishing these principles, the regulations circumscribe the decision to use operating subsidiaries so that it remains only "incidental" to the "business of banking."

In regulating the conduct of operating subsidiaries, moreover, the OCC is regulating only those activities it is explicitly authorized to regulate under the Bank Act. For federal regulatory purposes, in other words, the OCC is treating each operating subsidiary for the most part as if it were a national bank itself, conducting the same activities. In the latter instance, of course, the OCC's regulatory authority is unquestioned. As we concluded twenty-eight years ago, "whatever the scope of such [incidental] powers may be, we believe the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking." *M & M Leasing*, 563 F.2d at 1382.

**[8]** We conclude that the OCC has permissibly applied 12 U.S.C. § 93a to regulate operating subsidiaries of national banks.

## D. The OCC's Exclusive Authority To Regulate Operating Subsidiaries

**[9]** As the Supreme Court has explained:

> When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is . . . limited: "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (quoting *United States v. Shimer*, 367 U.S. 374, 383 (1961)) (alteration in original); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986) ("Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."); *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1128 (9th Cir. 2005); *Lopez v. Wash. Mut. Bank, FA*, 302 F.3d 900, 906 (9th Cir. 2002), *amended by* 311 F.3d 928 (9th Cir. 2002).

**[10]** Applying these principles here, we conclude that promulgating § 7.4006 was within the OCC's authority. Section 7.4006 provides that a state law is preempted as applied to an operating subsidiary only if it would be preempted as applied to a national bank. By so stating, the OCC has simply explicated further its specification, in 12 C.F.R. § 5.34(e)(1) and (3), that operating subsidiaries are to have the *same* authority as, and be subject to the *same* governmental regulation as, their national banks parents, by making clear in § 7.4006 that the principle is symmetrical: Operating subsidiaries are subject to no less *and* no more governmental regulation, state and federal, than national banks. The connection between the

OCC's substantive determinations regarding the authority of national banks to conduct their business through operating subsidiaries and the preemption regulation is thus close and logical. We are therefore convinced that once the OCC's authority to allow the creation of and to regulate operating subsidiaries as it has done is established, its authority to displace contrary state regulation where the Bank Act itself preempts contrary state regulation of national banks follows.[15] That § 7.4006 is "a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," *Fidelity*, 458 U.S. at 154 (internal quotation marks omitted), is further supported by an unusual provision in the Bank Act itself. Indeed, 12 U.S.C. § 43 specifically contemplates that the OCC sometimes has authority to preempt state laws such as those here at issue. *See* 12 U.S.C. § 43 (setting procedural prerequisites for OCC regulations preempting "[s]tate law regarding community reinvestment, *consumer protection*, fair lending, or the establishment of intrastate branches" (emphasis added)).[16]

With this general approval of the OCC's preemptive authority regarding state law regulation of national bank operating subsidiaries in mind, we turn to the specific state laws that WFHMI and the OCC maintain are preempted under § 7.4006.

---

[15]*Accord Wachovia Bank, N.A. v. Burke*, No. 04-3770-CV, 2005 WL 1607740 (2d Cir. July 11, 2005) (holding the Bank Act and OCC regulations preempt state banking laws concerning subsidiaries of nationally chartered banks to the same extent that they preempt regulation of the parent national bank).

[16]As the Commissioner here maintains, the laws he is seeking to enforce concern consumer protection. Section 43 prescribes the procedures that "the appropriate Federal banking agency," in this instance the OCC, *see* 12 U.S.C. § 1813(z), must follow whenever it issues an "opinion letter or interpretive rule" concluding that certain state laws, including consumer protection laws, are preempted as applied to national banks, *see id.* § 43(a). There is no allegation in this case that the OCC did not follow the requisite procedures.

### 1.   Visitorial Power Under the Bank Act

WFHMI and the OCC submit that the Commissioner's state law authority to conduct or require audits of national bank operating subsidiaries is displaced by § 7.4006. Their argument, with which we agree, is that section 54 of the Bank Act, 12 U.S.C. § 484, makes federal "visitorial" authority — but not necessarily federal substantive law — exclusive with regard to national banks, and § 7.4006 extends that exclusivity to operating subsidiaries.

[11] Since shortly after the Bank Act was enacted in 1864,[17] *see Nat'l Bank v. Kentucky*, 76 U.S. (9 Wall.) 353, 362 (1870), the Supreme Court has oft reiterated that federal substantive authority over national banks is not exclusive. Rather, states may regulate national banks where "doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Barnett Bank*, 517 U.S. at 33; *see also id.* (citing cases). "Thus, states retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law." *Bank of Am.*, 309 F.3d at 559.

[12] One area of authority over national banks that *has* historically been the exclusive province of the federal government, however, is the "visitorial" power. For purposes of the Bank Act and OCC regulations, the OCC has defined "visitorial" power as "(i) [e]xamination of a bank; (ii) [i]nspection of a bank's books and records; (iii) [r]egulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) [e]nforcing compliance with any applicable federal or state laws concerning those activities." 12

---

[17]Although the Bank Act was promulgated in 1864, the current banking statutes largely derive from the Bank Act's immediate predecessor, the National Currency Act of 1863, ch. 58, 12 Stat. 665. *See U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 449 & n.4 (1993) (summarizing the statutory history).

C.F.R. § 7.4000(a)(2). The exclusivity of federal visitorial authority over national banks is codified in the Bank Act, section 54 of which provides that:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

12 U.S.C. § 484(a).[18]

As the definition makes clear, the preemption of state law accomplished by § 484(a) is entirely procedural, not substantive. The exclusively federal power to "visit" national banks is not the power to oust all state regulation of those entities. Instead, the exclusivity of visitorial authority preempts only *enforcement* of state visitation laws by *state officials*, subject to the exceptions stated in § 484(a) itself. *See, e.g.*, *Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 989 (3d Cir. 1980); *cf. Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1260 (9th Cir. 1979) (holding that regulatory control provided by California's Housing Financial Discrimination Act is procedurally preempted by Federal Home Loan Bank Board authority), *summarily aff'd*, 445 U.S. 921 (1980) (mem.). National banks remain bound by state laws and regulations, except for those laws substantively preempted by other provisions of the Bank Act.

**[13]** Still, despite its procedural limitation, § 484(a) does "evidence[ ] a broad intent to preempt state law as to national banks." *Wachovia Bank, N.A. v. Burke*, 319 F. Supp. 2d 275, 279 (D. Conn. 2004), *aff'd in part, rev'd and vacated in part*

---

[18]But for minor technical corrections in 1913 and 1982, the provision remains unchanged from its initial codification in 1864. *See* Act of June 3, 1864, ch. 106, § 54, 13 Stat. 99, 116.

*on other grounds*, No. 04-3770-CV, 2005 WL 1607740 (2d Cir. July 11, 2005); *see also Guthrie v. Harkness*, 199 U.S. 148, 159 (1905) ("It was the intention that this statute should contain a full code of provisions upon the subject, and that no state law or enactment should undertake to exercise the right of visitation over a national corporation. Except in so far as such corporation was liable to control in the courts of justice, this act was to be the full measure of visitorial power."); *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. (18 Wall.) 409, 412 (1873). The power the Commissioner claimed in ordering WFHMI and NCMC to audit their loan records rests on precisely the inspection and enforcement authority preempted by § 484(a). The OCC's conclusion that § 484(a) and § 7.4006, taken together, foreclose the exercise of such authority by the states, is thus eminently "permissible." *Chevron*, 467 U.S. at 843.

**[14]** We hold that the Commissioner is preempted from ordering regulatory audits of national bank operating subsidiaries such as WFHMI and NCMC, and that the injunction issued by the district court is valid insofar as it precludes the Commissioner from doing so.

## 2. Licensing Authority Under the Bank Act

WFHMI and, particularly, the OCC also argue that California's state real-estate lending licensing requirements are preempted as applied to national bank operating subsidiaries.

The state law requirements here at issue are codified in sections 50120-50130 of the California Finance Code, part of the CRMLA.[19] Although the licensing requirements as a whole are too exhaustive to recount here, the most significant provisions are section 50121, which imposes four conditions on the

---

[19]We focus here on the CRMLA licensing requirements. The CFLL licensing requirements, which, as noted above, are relevant only where the CRMLA does not apply, *see ante* at 10461 n.5, are codified at CAL. FIN. CODE §§ 22100-22112.

granting of a license,[20] and section 50125(a), which empowers the Commissioner to refuse to issue a license if "[t]he applicant is not in material compliance with a provision of [the CRMLA] or an order or rule of the commissioner."

In light of the foregoing discussion, one might expect that the proper route to evaluating whether the state law provisions can apply to national bank operating subsidiaries would be to apply the same analysis we applied to the visitorial preemption issue: If state licensing requirements are preempted as applied to national banks, then § 7.4006 precludes applying those requirements to operating subsidiaries. As it turns out, this straightforward approach does not work as applied to licensing requirements.

---

[20]Specifically, the provision authorizes the Commissioner to issue a license only after:

    (a)    The filing with the commissioner of a complete and verified application for licensure.

    (b)    The filing as an exhibit to the application of a listing of material judgments filed against, and bankruptcy petitions filed by, the applicant for the preceding five years, and the disposition thereof.

    (c)    The payment of a nonrefundable investigation fee of one hundred dollars ($100), plus the cost of fingerprint processing and clearance, and an application filing fee of nine hundred dollars ($900).

    (d)    An investigation of the statements required by [California Financial Code §] 50124 based upon which the commissioner is able to issue findings that the financial responsibility, criminal records (verified by fingerprint, at the discretion of the commissioner), experience, character, and general fitness of the applicant and of the partners or members thereof, if the applicant is a partnership or association, and of the principal officers and directors thereof, if the license applicant is a corporation, support a finding that the business will be operated honestly, fairly, and in accordance with the requirements of this division.

CAL. FIN. CODE § 50121.

Licensing is one mode of regulation as to which there is no ready parallel between national banks and their operating subsidiaries. The California licensing requirements at issue here, for example, do not apply to national banks. *See* CAL. FIN. CODE § 50003(g)(1) (exempting from the CRMLA's licensing requirements "[a]ny bank . . . doing business under the authority of or in accordance with a license, certificate, or charter issued by the United States"); *see also id.* § 22050(a) (providing that the CFLL's licensing requirements do not apply to "any person doing business under any law of this state or the United States relating to banks").

That California saw fit to exempt national banks from its mortgage-lending licensing requirements despite their prevalent activity in that area of business may well reflect the state's own conclusion — almost certainly a correct one — that the chartering of national banks by the federal government is an exclusive function, inconsistent with state licensing requirements unless they are federally authorized.[21] Operating subsidiaries, however, are not directly chartered by the federal government; instead, they are incorporated under a state's law — WFHMI in California; NCMC in Ohio. This chartering distinction is the one irreducible difference between national banks and their operating subsidiaries, and precludes the direct transfer of the banks' immunity from state entry barriers, such as licensing requirements, to their operating subsidiaries.

We are convinced, however, by the OCC's alternative argument — that California's attempt to license operating subsidiaries is field-preempted by the OCC's own licensing regulations.[22]

---

[21]The Bank Act itself refers to the charter as the "organization certificate," which is created by the bank according to the terms of 12 U.S.C. §§ 21-23, and approved by the Comptroller pursuant to the procedures set forth in 12 U.S.C. §§ 26-27.

[22]The substantive limits of the Bank Act's express preemption provisions do not preclude the possibility of implicit preemption. "[T]he inclu-

**[15]** The OCC regulations establish a comprehensive and finely calibrated scheme for the creation of operating subsidiaries. Denominated "Licensing Requirements," *see* 12 C.F.R. § 5.34(b), these regulations prescribe the specific circumstances in which a national bank needs formal approval from the OCC to establish operating subsidiaries.

A national bank must ordinarily "submit an application to, and receive approval from, the OCC," before it acquires or establishes any operating subsidiary. *See id*. § 5.34(e)(5) (i)(A). "The application must include a complete description of the bank's investment in the subsidiary, the proposed activities of the subsidiary, the organizational structure and management of the subsidiary, the relations between the bank and the subsidiary, and other information necessary to adequately describe the proposal." *Id*.

In some circumstances, national banks can create or acquire an operating subsidiary without OCC approval, although notice to the OCC is required: Under 12 C.F.R. § 5.34(e) (5)(iv), operating subsidiaries can be established by a "well capitalized" and "well managed" national bank (as defined by 12 C.F.R. § 5.34(d)(2)-(3)) solely by providing notice to the OCC, so long as the activity falls within one of twenty-five categories specifically delineated in 12 C.F.R. § 5.34(e)(5)(v). No notice is required, however, for a well-capitalized bank to establish an operating subsidiary, if the new subsidiary is conducting activities already approved for an earlier operating subsidiary of the same bank; those activities are legally permissible for the subsidiary; and the new subsidiary abides by any conditions the OCC imposed on the activities of prior operating subsidiaries of that bank. *See id*. § 5.34(e)(5)(vi). If

sion of an express preemption provision in a statute does not by itself obviate implied preemption . . . ." *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995); *see also Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 404 (6th Cir. 2001) (citing *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233 (1944)).

the bank, however, "controls the subsidiary but owns 50 percent or less of the voting (or similar type of controlling) interest of the subsidiary," then an application and OCC approval are *always* necessary, and the exceptions noted above are inapplicable. *See id*. § 5.34(e)(5)(i)(B). The OCC thus has a role in either pre-approving or later reviewing the creation of an operating subsidiary in most instances.

That the OCC has chosen to require formal agency approval in certain cases but not in others, to require notice in certain cases but not in others, and to specify the content of the application or notice in great detail indicates to us that § 5.34 manifests the OCC's intent to regulate pervasively the field of licensing operating subsidiaries. Allowing certain national banks to create certain classes of operating subsidiaries without case-by-case approval is itself a regulatory decision. Where such a decision *not* to regulate represents, as in § 5.34, a considered determination that no regulation is appropriate, that choice preempts contrary state law imposing governing standards. *See, e.g.*, *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 140 (1976) (holding that, by regulating certain forms of economic pressure used during labor disputes but not others, Congress expressed a clear intent to leave other economic weapons free from federal *or* state regulation). Such field preemption can occur when an agency, acting pursuant to its delegated authority, promulgates regulations that evidence a clear intent to occupy a specific field. *See, e.g.*, *R.J. Reynolds Tobacco Co. v. Durham County, N.C.*, 479 U.S. 130, 149 (1986) ("[W]here, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field completely." (citation omitted)).

[16] As we emphasized earlier, Congress and the OCC, acting pursuant to congressional authority, have left some room

for substantive regulation by the states in the field of banking. In the specific context of licensing requirements for operating subsidiaries authorized only to conduct those activities that their parent national banks may conduct, however, the OCC's regulations "evidence a desire to occupy a field completely."[23] *Id.* A state's attempt to require advance licensing before an operating subsidiary may engage in the activities covered by the Bank Act, including real estate lending, runs headlong into the OCC's finely nuanced licensing scheme.

**[17]** We hold that California's real-estate lending licensing requirements as applied to operating subsidiaries of national banks are field-preempted by 12 C.F.R. § 5.34.

## III.   DIDMCA Preemption

Wells Fargo also maintains that the California "per diem" loan-interest statute the Commissioner sought to enforce, precluding the charging of mortgage interest during certain pre-recordation periods, is substantively preempted by the DID-MCA. Despite our earlier rulings, we must decide this substantive preemption issue because it is pertinent to the reach of the permanent injunction the district court may properly issue.

**[18]** In relevant part, the DIDMCA express preemption provision, section 501(a)(1), mandates that "[t]he provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance . . . ." that meets certain conditions. 12 U.S.C. § 1735f-7a(a)(1); *see also Brown v. Investors Mortgage Co.*, 121 F.3d 472, 475 (9th Cir. 1997) (per curiam)

---

[23]Whether the preemption analysis would be the same for all OCC licensing of national bank subsidiaries, including financial subsidiaries, is a question not before us, and one on which we express no opinion.

(summarizing and applying the statute). Neither party disputes that WFHMI's home-lending activities here at issue meet the other conditions imposed by the DIDMCA exemption. The debate is solely whether the California per diem interest statute "expressly limit[s] the rate or amount of interest."

The California statutory provision with which we are concerned is CAL. CIV. CODE § 2948.5(a).[24] At the relevant times,[25] that section provided:

> A borrower shall not be required to pay interest on a principal obligation under a promissory note secured by a mortgage or deed of trust on real property improved with between one to four residential dwelling units for a period in excess of one day prior to recording of the mortgage or deed of trust if the loan proceeds are paid into escrow or, if there is no escrow, the date upon which the loan proceeds have been made available for withdrawal as a matter of right, as specified in subdivision (d) of Section 12413.1 of the Insurance Code.

If a congressional statute includes a provision explicitly preempting state law, the only issue we must decide is its scope, using ordinary tools of statutory construction. *See, e.g.*, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517-18

---

[24]The district court referenced section 50204(*o*) of the California Finance Code, which bars CRMLA licensees from "[c]ommit[ting] an act in violation of Section 2948.5 of the Civil Code." Our holding that the CRMLA licensing requirements are preempted means that section 50204(*o*) is (and was) not enforceable against operating subsidiaries. The applicability of section 2948.5, however, does not turn on whether the lender is a licensee. Our conclusion that California's licensing requirements are preempted therefore does not moot the DIDMCA preemption issue.

[25]The provision has since been amended, and now bars the collection of per diem interest more than one day before disbursement, as opposed to before recordation.

(1992); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 928 (9th Cir. 2003). The determinative question under the DIDMCA preemption provision, 12 U.S.C. § 1735f-7a(a)(1), is thus whether section 2948.5(a) serves "*expressly*" to limit the "rate or amount of interest" that WFHMI may assess against California borrowers.

The district court concluded that it does. In its words:

> California's per diem statutes limit the time during which interest can be charged by prohibiting a lender from charging interest on loaned mortgage funds for a period in excess of one day prior to recordation of the mortgage. By restricting the time period in which a lender may collect interest on loaned mortgage funds, the language of the per diem statutes "expressly limit[s] the rate or amount of interest . . . which may be charged . . . ."

*Wells Fargo II*, 265 F. Supp. 2d at 1175 (quoting 12 U.S.C. § 1735f-7a(a)(1)) (alteration in original) (citations omitted).

We do not agree with this interpretation of the DIDMCA. We are instead convinced by the First Circuit's analysis in *Grunbeck v. Dime Savings Bank of New York, FSB*, 74 F.3d 331 (1st Cir. 1996), and believe it fully applicable to California's per diem loan-interest statute.

In *Grunbeck*, the court considered whether section 501(a)(1) of the DIDMCA preempted New Hampshire's simple interest statute (SIS), which required lenders to compute their interest rate by summing "simple interest," *i.e.*, by not charging interest on unpaid interest. *See* N.H. REV. STAT. ANN. § 397-A:14. Dime Savings Bank argued that requiring lenders to abide by the SIS would implicate the "rate or amount of interest" chargeable against the borrower, and that the SIS was therefore preempted by the DIDMCA. The First Circuit

held that there was no DIDMCA preemption, for two primary reasons, both persuasive and both applicable here:

**[19]** First, *Grunbeck* emphasized that the DIDMCA is concerned with only the "rate" and "amount" of interest charged, not with other features of the interest calculation:

> [Dime Savings Bank's] arguments rest on the implicit premise that the "amount" of interest the lender may charge is "limited" by the SIS. On the contrary, the SIS imposes no restriction on either the "rate" or the "amount" of interest the borrower may be charged, but merely requires that *any* interest rate or amount agreed to by the parties be *computed* on a "simple interest" basis. Thus, nothing in the SIS prevents a lender from contracting for whatever *simple* interest rate will exact an interest return equal to or greater than whatever rate and amount of interest would be recoverable through compounding. The SIS leaves entirely to the parties the rate and amount of simple interest to be exacted.

*Id.* at 337.

**[20]** Here, similarly, the only direct restriction was on the time for which interest may be charged, not on the rate that may be charged when interest is in effect or the total amount of interest that may be charged over the life of the loan.[26] Banks were free to alter the post-recordation rate of interest to account for any pre-recordation no-interest period, thereby collecting the same total amount of interest as they would have collected had they charged interest pre-recordation. We agree with the First Circuit's approach, and hold that where "rates" and "amounts" of interest remain fully adjustable so

---

[26]However compounded, an interest rate is usually defined as "a percentage of the principal payable for a one-year period," Black's Law Dictionary 831 (8th ed. 2004) — that is to say, a certain percent *per year*.

that banks can obtain the same return that they would have otherwise, a state regulation is not banned by the DIDMCA.

Second, and relatedly, *Grunbeck* gave careful attention to an unusual feature of the language of section 501(a)(1) of the DIDMCA — that it preempts only *express* limitations on rates and amounts of interest. As *Grunbeck* explained, this textual feature must be given effect by "focus[ing] . . . on whether the 'express' language of the [state statute] 'limit[s]' the rate or amount of interest which the lender may charge," *not* "on broad-gauged assessments concerning the likely *impact* the [state] ban on compounding would have on home-mortgage lenders and the industry at large." *Id*. at 337-38 (third alteration in original). Any other "analytic focus . . . undermines the required 'plain language' interpretation by extirpating — from the pivotal section 501(a) clause: 'expressly limiting the rate or amount of interest' — the important modifier 'expressly.' " *Id*. at 337 (citation omitted).

With this textual analysis we agree as well. Here, as in *Grunbeck*, there may well be practical reasons why banks will not adjust their rates or amounts of interest to account for the state restriction. As *Grunbeck* held, however, the DIDMCA does not apply because of "likely *impact*," as long as there is no *express* limitation on interest rates or amounts.[27]

Wells Fargo argues that, aside from any impact theory, the California per diem statute *does* expressly limit an interest rate — it limits interest to zero percent for the period prior to recordation. While clever, this argument again disregards the critical and unusual modifier, "expressly."

---

[27]For reasons identified by *Grunbeck*, Quicken's argument that we should defer to the interpretation of the federal Office of Thrift Supervision is deficient. *See Grunbeck*, 74 F.3d at 336 ("Where Congress has spoken directly to the issue, an interpretation rendered by the agency responsible for administering the statute is entitled to no special deference." (citing *Chevron*, 467 U.S. at 842)).

"Expressly" the per diem interest statute addresses only the time period for which interest may be assessed, not the rate of interest permissible for a period during which some interest is payable. It would be odd to refer to a prohibition on collection of interest as a limitation specifically on the *rate* of interest, as opposed to a limitation on the imposition of interest or on the time period which interest may cover. Also, the evident purpose of the statute, albeit imperfectly addressed, is to protect consumers by providing an incentive for completion of tasks necessary to perfect the purchase, not to limit the rate or amount of interest paid; as long as recordation was completed, any amount of interest could be charged.

**[21]** For these reasons, we hold that California's per diem interest statute, CAL. CIV. CODE § 2948.5, is not preempted by section 501(a)(1) of the DIDMCA, 12 U.S.C. § 1735f-7a(a)(1).

### *Conclusion*

As Justice Jackson forcefully put it a half-century ago, "[w]e cannot resolve conflicts of authority by our judgment as to the wisdom or need of either conflicting policy. The compact between the states creating the Federal Government resolves them as a matter of supremacy." *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 378-79 (1954).

"[A]s a matter of supremacy," the Bank Act, read together with 12 C.F.R. § 7.4006, preempts the exercise of visitorial authority over operating subsidiaries of national banks. Likewise, 12 C.F.R. § 5.34 field-preempts California's licensing authority over such entities.[28] Section 501(a)(1) of the DIDMCA, however, does not preempt California's per diem loan-interest statutes.

---

[28]Wells Fargo asserted in its briefs before this court that we need not reach its retaliation claim against the Commissioner if we conclude that the licensing requirements are preempted. Because we so conclude, we deem this argument abandoned.

We therefore remand these appeals to the district court for modification of the permanent injunction entered against the Commissioner, and for further proceedings as necessary, consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**[29]

---

[29]Each party shall bear its own costs on appeal. *See* Fed. R. App. P. 39(a)(4).