*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0476p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WACHOVIA BANK, N.A. and WACHOVIA MORTGAGE CORPORATION,

        *Plaintiffs-Appellees,*

    *v.*

LINDA A. WATTERS, Commissioner of the Michigan Office of Insurance and Financial Services,

        *Defendant-Appellant.*

No. 04-2257

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 03-00105—Robert Holmes Bell, Chief District Judge.

Argued: October 27, 2005

Decided and Filed: December 19, 2005

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** E. John Blanchard, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Lori McAllister, DYKEMA GOSSETT, Lansing, Michigan, for Appellees. **ON BRIEF:** John C. Scherbarth, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Lori McAllister, William J. Perrone, DYKEMA GOSSETT, Lansing, Michigan, for Appellees. Jessica Dvorak, IOWA ATTORNEY GENERAL'S OFFICE, Des Moines, Iowa, Gregory L. McClelland, McCLELLAND & ANDERSON, Lansing, Michigan, Frederick C. Schafrick, GOODWIN PROCTER, Washington, D.C., Douglas B. Jordan, OFFICE OF THE COMPTROLLER OF THE CURRENCY, Washington, D.C., for Amici Curiae.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. The question before us is whether the National Bank Act and regulations promulgated by the Office of the Comptroller of the Currency preempt

1

Michigan banking laws concerning operating subsidiaries of nationally chartered banks.[1]  The district court held that the Michigan laws are preempted and granted summary judgment in favor of Wachovia.  The State of Michigan filed its notice of appeal on January 27, 2004.  Since that time, the federal district court for the District of Maryland, and the United States Courts of Appeal for the Second and Ninth Circuits ruled on precisely the issue we address today.  *See Wachovia Bank v. Burke*, 414 F.3d 305 (2d Cir. 2005); *Wells Fargo Bank v. Boutris*, 419 F.3d 949 (9th Cir. 2005); *National City Bank v. Turnbaugh*, 367 F. Supp. 2d 805 (D. Md. 2005).  Each of those courts held that the National Bank Act and the regulations promulgated by the Comptroller preempt conflicting state laws.  Because we agree with the outcome and reasoning of those courts's decisions, we hold that the National Bank Act and the regulations at issue preempt the conflicting Michigan law.  We further hold that the regulations do not violate the Tenth Amendment to the United States Constitution.  We therefore affirm the district court's grant of summary judgment in favor of Wachovia.

## I.

The parties agree that no material facts are disputed.  Michigan has enacted a series of banking laws that are enforced by the defendant, the Commissioner of the Michigan Office of Insurance and Financial Services.  As explained by the district court, two Michigan statutes are at issue.  *See* MICH. COMP. LAWS § 445.1651 *et seq*. MICH. COMP. LAWS § 493.51 *et seq*.  Pursuant to these statutes, Wachovia Mortgage must register with the State, but is not required to obtain a license to operate.  *See* MICH. COMP. LAWS § 445.1652, 493.52.  Moreover, Michigan's regulatory scheme permits it to investigate a specific consumer complaint if the complaint is not otherwise being pursued by the Comptroller.  *See* MICH. COMP. LAWS § 445.1663(2) ("[T]he commissioner . . . shall make no investigation of the complaint if the complaint is being adequately pursued by the appropriate federal regulatory authority.").  Finally, the Michigan statutes also require Wachovia to provide a financial statement annually, to pay an annual operating fee, to maintain certain documents, and to retain those documents for examination by the Commissioner.  *See* MICH. COMP. LAW §§ 445.1657(2), 493.56a(2), 445.1658(1), 493.54, 445.1671, 493.68.

Wachovia Bank is a national banking association chartered under the National Bank Act, 12 U.S.C. § 21 *et seq*.  Wachovia Mortgage originally registered in Michigan to make first mortgage loans as it does in various states.  On January 1, 2003, Wachovia Mortgage became a wholly owned operating subsidiary of Wachovia Bank.  After July 1, 2003, Wachovia Mortgage also began making second mortgage loans in Michigan.

On April 3, 2003, Wachovia Mortgage advised the State of Michigan that it was surrendering its lending registration in Michigan.  The Commissioner responded by advising Wachovia Mortgage that effective July 1, 2003, Wachovia Mortgage would no longer be authorized to conduct mortgage lending activities within the State.  Wachovia then filed suit seeking a declaration that the Michigan statutes at issue are preempted by the National Banking Act and the Comptroller's regulations.

---

[1]The specific Michigan laws at issue in this case are: (a) provisions requiring registration before a mortgage lender may conduct business in Michigan: MICH. COMP. LAWS §§ 445.1652(1), 445.1656(1)(d), 445.1679(1)(a), 493.52(1), and 493.53a(d); (b) provisions requiring the payment of fees on initial application for registration, or renewals thereafter: MICH. COMP. LAWS §§ 445.1658, 445.1657(1), 493.54, and 493.56a(2); (c) provisions requiring that annual financial statements be submitted to the Commissioner and certain documents retained in a particular format: MICH. COMP. LAWS §§ 445.1657(2), 445.1671, 493.56a(2), and 493.56a(13); (d) provisions placing registrants under the "general supervision and control" of the Commissioner, with the power to conduct examinations and investigations: MICH. COMP. LAWS §§ 445.1661, 493.56b; (e) provisions permitting the Commissioner to investigate a complaint from any person if the appropriate federal regulatory authority is not pursuing it "adequately": MICH. COMP. LAWS § 445.1663; and (f) provisions allowing the Commissioner to take regulatory or other actions based on violations of the provisions set forth above: MICH. COMP. LAWS §§ 445.1665, 445.1666, 493.58-59, and 493.62a.

## II.

We review a district court's decision to grant summary judgment *de novo*. *Bennett v. Eastpointe*, 410 F.3d 810 (6th Cir. 2005). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties agree that no material facts are disputed and therefore only two legal issues are before the Court: (1) do the National Bank Act and the Comptroller's regulations preempt the Michigan laws' application to Wachovia and (2) do the Comptroller's regulations violate the Tenth Amendment to the United States Constitution? We answer yes to the first question and no to the second.

The National Bank Act was enacted in 1864 "to facilitate . . . a national banking system." *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315 (1978) (internal quotation omitted). Relevant to our discussion, the National Bank Act establishes nationally chartered banks and vests these banks with certain powers, including "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). To prevent state regulation of the national banking system, the Act provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal Law . . . ." 12 U.S.C. § 484(a).

The Office of the Comptroller of the Currency is the federal administrative agency with the "primary responsibility for surveillance of 'the business of banking' authorized by § 24 Seventh." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995). Congress has authorized the agency to promulgate rules and regulations, and the agency may use its authority to define the "incidental powers" of national banks beyond those specifically enumerated in the Civil War era statute. *See id.* at 258 ("[T]he business of banking is not limited to the enumerated powers in § 24 Seventh . . . [and] the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated."); *see also* 12 U.S.C. § 93a. Drawing on its authority, the Comptroller has issued a regulation that, subject to certain exceptions, it has exclusive visitorial powers over national banks. 12 C.F.R. § 7.4000 (including the power to examine national banks, inspect their records, and regulate their activities authorized by federal law).

As Wachovia notes in its brief, additional regulations are relevant to this case. One such regulation is 12 C.F.R. § 5.34, providing that a "national bank may conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking." 12 C.F.R. § 5.34(e)(1); *see also Wells Fargo Bank*, 419 F.3d at 960 (noting that "permitting operating subsidiaries does not expand the functions carried out by the banks"). Moreover, "[a]n operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms, and conditions that apply to the conduct of such activities by its parent national bank." 12 C.F.R. § 5.34(e)(3). This reflects the Comptroller's view — held since the 1960s — that the practice of using an operating subsidiary to conduct the business of banking is an appropriate incidental power under 12 U.S.C. § 24 (Seventh).

The federal regulation the State of Michigan argues most vehemently against was adopted in 2001 and promulgated as 12 C.F.R. § 7.4006. It states that "[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." 12 C.F.R. § 7.4006. Michigan argues that the Comptroller exceeded its congressionally delegated authority by promulgating section 7.4006 because the regulation impermissibly expands the definition of "national bank." The State further argues that a federal regulatory agency cannot preempt state laws unless Congress has expressly and clearly manifested an intent for it to do so.

Michigan's argument regarding preemption is "misdirected." *Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982). The type of preemption at issue in this case is "conflict preemption," which can arise where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 153 (internal questions and citations omitted).[2] Michigan does not dispute the fact that its regulatory scheme stands as an obstacle to the National Banking Act and the relevant regulations promulgated by the Comptroller. Thus, the only question is whether the Comptroller "has exceeded [its] statutory authority or acted arbitrarily." *Id.* at 154. Contrary to Michigan's arguments, a "pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Id.* at 154. Such a "narrow focus" is "misdirected." *Id.*[3]

We therefore decline Michigan's invitation to frame the issue as whether Congress has expressly and clearly manifested its intent to preempt state laws such as Michigan's and instead focus on whether the Comptroller has exceeded its authority or acted arbitrarily. We do so through the framework established by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984); *see also NationsBank*, 513 U.S. at 257-58 (applying the *Chevron* doctrine to determine whether the Office of the Comptroller of the Currency was authorized to grant a national bank's application to sell annuities); *Boutris*, 419 F.3d at 958 (applying *Chevron* to answer exact question posed in this case); *Burke*, 414 F.3d at 315 (same). The district court appropriately conducted its analysis pursuant to *Chevron* and concluded that the regulations are within the Comptroller's authority and are a reasonable interpretation of the statute. We agree.

Under *Chevron*, we are confronted with two questions. First, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see also NationsBank*, 513 U.S. at 257 (asking "whether the intent of Congress is clear as to the precise question at issue"). If Congress's intent is clear, "that is the end of the matter. But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *NationsBank*, 513 U.S. at 257 (internal quotation and citation omitted). Any ambiguities require us to "give great weight to any reasonable construction" of the statutes by the Comptroller. *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 403 (1987); *see also NationsBank*, 513 U.S. at 257; *De la Cuesta*, 458 U.S. at 153-54.

We conclude that Congress has not spoken precisely on the issue. Contrary to Michigan's arguments, the Comptroller's regulations do not expand the definition of "national bank" as Congress used it in section 484 to include an "operating subsidiary," such as Wachovia Mortgage. Rather, the regulations interpret a national bank's "incidental powers" under 12 U.S.C. § 24 (Seventh) to include the power to conduct business through an operating subsidiary. *See* 12 C.F.R. § 5.34. As the Comptroller explained in promulgating 12 C.F.R. § 7.4006, "operating subsidiaries have long been authorized for national banks and provide national banks with a convenient alternative to conduct activities that the bank could conduct directly." *See generally* Investment Securities; Bank Activities and Operations; Leasing, 66 Fed. Reg. 34,788 (July 2, 2001) (announcing

---

[2] "Federal regulations have no less pre-emptive effect than federal statutes." *De la Cuesta*, 458 U.S. at 153.

[3] Michigan does correctly assert that there is a presumption against preemption in areas of regulation typically left to the states. "The presumption against federal preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time. Regulation of federally chartered banks is one such area." *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 183 (2d Cir. 2005). Likewise, as the Ninth Circuit has noted, "Congress has legislated in the field of banking from the days of *M'Culloch v. Maryland*, creating an extensive federal statutory and regulatory scheme. The history of national banking legislation has been one of interpreting grants of both enumerated and incidental powers to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting contrary state law." *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (internal quotation and citation omitted).

final rule). Regulation section 7.4006 makes clear that states cannot obstruct a national bank's power, granted to it by Congress and federal regulations, to conduct "the business of banking" through the use of operating subsidiaries, by imposing state laws and regulations on the subsidiaries that could not be imposed on the parent. *See Burke*, 414 F.3d at 316. Thus, "[t]o the extent that using an operating subsidiary is a legitimate power granted to national banks, 12 U.S.C. § 484 provides the OCC with ample authority to preempt states from exercising visitorial powers over the subsidiary because such state regulation could interfere with the national bank's exercise of its federal powers." *Id.* (citation omitted).

Furthermore, as noted above the National Bank Act was enacted in 1864. Operating subsidiaries were not recognized as a legitimate tool for carrying on the business of banking until the 1960s. *See* 69 Fed. Reg. 1895; Acquisition of Controlling Stock Interest in Subsidiary Operations Corporation, 31 Fed. Reg. 11,441, 11,459 (Aug. 31, 1966). "Overall, the history of the banking laws indicates that operating subsidiaries have been treated distinctly by Congress and the OCC, and no statute speaks directly to the scope of federal versus state power over them." *Burke*, 414 F.3d at 318. The Comptroller has the authority to define a national bank's "incidental powers" to include conducting the business of banking — in this case the making of first and second mortgage loans — through an operating subsidiary. Thus, Wachovia Bank itself can make first and second mortgage loans and it can also do so through an operating subsidiary such as Wachovia Mortgage. *See* 12 C.F.R. § 5.34. "Having so defined a national bank's power to conduct business through an operating subsidiary, the OCC further has the authority to preempt state law concerning operating subsidiaries to the same extent that those laws would be preempted with respect to the parent national bank." *Burke*, 414 F.3d at 318 (citing 12 C.F.R. §§ 7.4006, 34.1, 34.4); *see also* 12 U.S.C. § 93a.

Michigan and *amici* further argue that by including references to "affiliates" in other sections of the statute, but failing to do so in section 484, Congress unambiguously intended to exclude such entities from the visitation exception. Both courts to address this argument have denied it, *Boutris*, 419 F.3d at 959 n.12; *Burke*, 414 F.3d at 317-18, and we do as well. Even assuming that the terms "operating subsidiary" and "affiliate" are synonymous,[4] the argument fails. The absence of any reference to operating subsidiaries does not convey the unambiguous intent of Congress. *See Boutris*, 419 F.3d at 959 n.12. The statutes cited that include the term "affiliate" — section 161(c), section 371c, section 371c-1, and section 481 — establish the duties of a national bank to report on the activities of its affiliates and the bank's relationship with its affiliates. In order to be comprehensible, the statutes *must* mention "affiliates." This does not mean, however, that any statute that does not mention "affiliates" reflects the unambiguous intent of Congress to exclude them from the provision. If anything, it indicates that Congress has only included reference to affiliates in the limited cases where they must be distinguished from national banks. Michigan and *amici* have pointed to no statutory sections that do not specifically pertain to the relationship between national banks and their affiliates that contain the term "affiliates" or "operating subsidiaries."

Thus, the only remaining determination pursuant to the *Chevron* analysis is whether the regulations are a reasonable construction of the statutory scheme. If the Comptroller's interpretation is reasonable, we must defer to its construction of the statute. *See NationsBank*, 513 U.S. at 257. We reject Michigan's arguments and conclude that the Comptroller's regulations are a reasonable construction of the National Bank Act.

---

[4]The Second Circuit addressed this argument in great detail and found evidence that "operating subsidiaries" and "affiliates" are not co-terminus. *Burke*, 414 F.3d at 316-17. The opinion proceeded, however, to analyze the two as if they were synonymous and concluded that there was no unambiguous intent. *Id.* at 317-18.

First, we do not find persuasive Michigan's argument that the regulations disregard the principle of corporate separateness. Rather, the regulations merely recognize that for decades national banks have been conducting the business of banking through operating subsidiaries. *See* 66 Fed. Reg. at 34,788 ("[f]or decades national banks have been authorized to use the operating subsidiary as a convenient and useful corporate form for conducting activities that the parent bank could conduct directly."). The regulations, specifically section 7.4006, simply reflect the eminently reasonable conclusion that when a bank chooses to utilize the authority it is granted under federal law, it ought not be hindered by conflicting state regulations. *See also Burke*, 414 F.3d at 319 ("Section 7.4006 reflects the OCC's policy judgment that national banks' use of operating subsidiaries as separately structured corporate entities is desirable and that it should not be hindered by state regulations."). This rationale was recognized as early as 1966 when the Comptroller explained: "The use of controlled subsidiary corporations provides national banks with additional options in structuring their businesses. National banks may desire to exercise such option for many reasons, including controlling operating costs, improving effectiveness of supervision . . . or separating particular operations of the bank from other operations." Acquisition of Controlling Stock Interest in Subsidiary Operations Corporation, 31 Fed. Reg. 11,441, 11,460 (Aug. 31, 1966); *see also* Rules, Policies and Procedures for Corporate Activities, 61 Fed. Reg. 60,342 (Nov. 27, 1996); Financial Subsidiaries and Operating Subsidiaries, 65 Fed. Reg. 12,905, 12,908-09 (Mar. 10, 2000); *see also Boutris*, 419 F.3d at 960 (noting that "[t]he determination whether to conduct business through operating subsidiaries or, instead, through subdivisions of the bank itself is thus essentially one of internal organization, so long as the operating subsidiary form or organization cannot be used to evade the rules that apply to national banks."). *Chevron* requires us to defer to this reasonable interpretation.

We find no merit in the remainder of Michigan's arguments and hold that the Comptroller's regulations preempt conflicting Michigan laws. "[T]he OCC regulations reflect a consistent and well-reasoned approach to preempting state regulation of operating subsidiaries so as to avoid interference with national banks' exercise of their powers under 12 U.S.C. § 24 (Seventh) and their ability to use operating subsidiaries in the dynamic market of banking and real estate lending." *Burke*, 414 F.3d at 321.

One final note regarding preemption: Michigan argues that should we affirm the district court's finding of preemption, "Michigan would be precluded from protecting its citizens from any inappropriate actions taken by state incorporated nonbank subsidiaries of national banks that operate in the mortgage industry." Appellant's Br. at viii. As the Supreme Court has stated, courts "cannot resolve conflicts of authority by our judgment as to the wisdom or need of either conflicting policy. The compact between the states creating the Federal Government resolves them as a matter of supremacy. However wise or needful [a state's policy], . . . it must give way to the contrary federal policy." *Franklin National Bank v. New York*, 347 U.S. 373 (1954). Michigan's recourse (and the recourse for the other thirty attorney generals as amicus curiae) is with Congress.

### III.

Michigan also argues that 12 C.F.R. § 7.4006 violates the Tenth Amendment to the United States Constitution. We agree with the district court that Congress assumed the authority to regulate national banks under the Commerce Clause. The Tenth Amendment, reserving to the states those rights and powers not enumerated, is therefore, not implicated by the National Bank Act or lawfully promulgated regulations thereunder.

### IV.

For the previously stated reasons, we affirm the district court's judgment granting summary judgment to Wachovia.