Justice Stevens,
with whom
The Chief Justice and Justice Scalia join, dissenting.
Congress has enacted no legislation immunizing national bank subsidiaries from compliance with nondiscriminatory state laws regulating the business activities of mortgage brokers and lenders. Nor has it authorized an executive agency to pre-empt such state laws whenever it concludes that they interfere with national bank activities. Notwithstanding the absence of relevant statutory authority, today the Court endorses an agency’s incorrect determination that the laws of a sovereign State must yield to federal power. The significant impact of the Court’s decision on the federal-state balance and the dual banking system makes it appropriate to set forth in full the reasons for my dissent.
*23 I
The National Bank Act (or NBA), 13 Stat. 99, authorized the incorporation of national banks, §5, id., at 100, and granted them “all such incidental powers as shall be necessary to carry on the business of banking,” § 8, id., at 101, (codified at 12 U. S. C. §24 Seventh), subject to regulatory oversight by the Comptroller of the Currency, § 54, 13 Stat. 116. To maintain a meaningful role for state legislation and for state corporations that did not engage in core banking activities, Congress circumscribed national bank authority. Notably, national banks were expressly prohibited from making mortgage loans, § 28, id., at 108.[1] Moreover, the shares of national banks, as well their real estate holdings, were subject to nondiseriminatory state taxation, §41, id., at 111; and while national banks could lend money, state law capped the interest rates they could charge, § 30, id., at 108.
Originally, it was anticipated that “existing banks would surrender their state charters and re-incorporate under the terms of the new law with national charters.”[2] That did not happen. Instead, after an initial post-National Bank Act decline, state-chartered institutions thrived.[3] What emerged was the competitive mix of state and national banks known as the dual banking system.
This Court has consistently recognized that because federal law is generally interstitial, national banks must comply *24 with most of the same rules as their state counterparts. As early as 1870, we articulated the principle that has remained the lodestar of our jurisprudence: that national banks
“are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government. . . . They are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional .” National Bank v. Commonwealth, 9 Wall. 353, 362 (1870) (emphasis added).[4]
Until today, we have remained faithful to the principle that nondiscriminatory laws of general application that do not “forbid” or “impair significantly” national bank activities should not be pre-empted. See, e. g., Barnett Bank of Marion Cty., N. A. v. Nelson, 517 U. S. 25, 33 (1996).[5]
*25 Nor is the Court alone in recognizing the vital role that state legislation plays in the dual banking system. Although the dual banking system’s main virtue is its divergent treatment of national and state banks,[6] Congress has consistently recognized that state law must usually govern the activities of both national and state banks for the dual banking system to operate effectively. As early as 1934, Justice Brandéis observed for the Court that this congressional recognition is embodied in a long string of statutes:
“The policy of equalization was adopted in the National Bank Act of 1864, and has ever since been applied, in the provision concerning taxation. In amendments to that Act and in the Federal Reserve Act and amendments thereto the policy is expressed in provisions conferring power to establish branches; in those conferring power to act as fiduciary; in those concerning interest on deposits; and in those concerning capitalization. It appears also to have been of some influence in securing the grant in 1913 of the power to loan on mortgage.” Lewis v. Fidelity & Deposit Co. of Md., 292 U. S. 559, 564-565 (footnotes, with citations to relevant statutes, omitted).[7]
For the same reasons, we observed in First Nat. Bank in Plant City v. Dickinson, 396 U. S. 122,133 (1969), that “[t]he policy of competitive equality is . .. firmly embedded in the statutes governing the national banking system.” So firmly embedded, in fact, that “the congressional policy of competi *26 tive equality with its deference to state standards” is not “open to modification by the Comptroller of the Currency.” Id., at 138.
II
Although the dual banking system has remained intact, Congress has radically transformed the national bank system from its Civil War antecedent and brought considerably more federal authority to bear on state-chartered institutions. Yet despite all the changes Congress has made to the national bank system, and despite its exercise of federal power over state banks, it has never pre-empted state laws like those at issue in this case.
Most significantly, in 1913 Congress established the Federal Reserve System to oversee federal monetary policy through its influence over the availability of credit. Federal Reserve Act §§ 2, 9, 38 Stat. 252,259. The Act required national banks and permitted state banks to become Federal Reserve member banks, and subjected all member banks to Federal Reserve regulations and oversight. Ibid. Also of signal importance, after the banking system collapsed during the Great Depression, Congress required all member banks to obtain deposit insurance from the newly established Federal Deposit Insurance Corporation. Banking Act of 1933 (or Glass-Steagall Act), §8,48 Stat. 168; see also Banking Act of 1935, 49 Stat. 684. Although both of these steps meant that many state banks were subjected to significant federal regulation,[8] “the state banking system continued along with the national banking system, with no attempt to exercise preemptive federal regulatory authority over the activities of the existing state banks.” M. Malloy, Banking and Financial Services Law 48 (2d ed. 2005).
*27 In addition to these systemic overhauls, Congress has over time modified the powers of national banks. The changes are too various to recount in detail, but two are of particular importance to this case. First, Congress has gradually relaxed its prohibition on mortgage lending by national banks. In 1913, Congress permitted national banks to make loans secured by farm land, Federal Reserve Act, § 24,38 Stat. 273, and in succeeding years, their mortgage lending power was enlarged to cover loans on real estate in the vicinity of the bank, Act of Sept. 7, 1916, §24, 39 Stat. 754, and loans “secured by first liens upon forest tracts which are properly managed in all respects,” Act of Aug. 15, 1953, ch. 510, 67 Stat. 614. Congress substantially expanded national banks’ power to make real estate loans in 1974, see Housing and Community Development Act, Title VII, § 711, 88 Stat. 716, and in 1982 it enacted the broad language, now codified at 12 U. S. C. § 371(a), authorizing national banks to make “loans . . . secured by liens on interests in real estate.” Garn-St Germain Depository Institutions Act of 1982, Title IV, §403, 96 Stat. 1510. While these changes have enabled national banks to engage in more evenhanded competition with state banks, they certainly reflect no purpose to give them any competitive advantage.[9]
Second, Congress has over the years both curtailed and expanded the ability of national banks to affiliate with other companies. In the early part of the century, banks routinely engaged in investment activities and affiliated with companies that did the same. The Glass-Steagall Act put an end to that. “[E]naeted in 1933 to protect bank depositors from any repetition of the widespread bank closings that occurred *28 during the Great Depression,” Board of Governors, FRS v. Investment Company Institute, 450 U. S. 46, 61 (1981), Glass-Steagall prohibited Federal Reserve member banks (both state and national) from affiliating with investment banks.[10] In Congress’ view, the affiliates had engaged in speculative activities that in turn contributed to commercial banks’ Depression-era failures.[11] It was this focus on the welfare of depositors — as opposed to stockholders — that provided the basis for legislative action designed to ensure bank solvency.
A scant two years later, Congress forbade national banks from owning the shares of any company because of a similar fear that such ownership could undermine the safety and soundness of national banks:[12] “Except as hereinafter provided or otherwise permitted by law, nothing herein contained shall authorize the purchase by [a national bank] for its own account of any shares of stock of any corporation.” Banking Act of 1935, § 308(b), 49 Stat. 709 (emphasis added). That provision remains on the books today. See 12 U. S. C. § 24 Seventh.
These congressional restrictions did not forbid all affiliations, however, and national banks began experimenting with new corporate forms. One of those forms involved the national bank ownership of “operating subsidiaries.” In 1966, the Comptroller of the Currency took the position “that *29 a national bank may acquire and hold the controlling stock interest in a subsidiary operations corporation” so long as that corporation’s "functions or activities . . . are limited to one or several of the functions or activities that a national bank is authorized to carry on.” 31 Fed. Reg. 11459 (1966). The Comptroller declined to read the categorical prohibition on national bank ownership of stock to foreclose bank ownership of operating subsidiaries, finding authority for this aggressive interpretation of national bank authority in the “incidental powers” provision of 12 U. S. C. § 24 Seventh. See 31 Fed. Reg. 11460.
While Congress eventually restricted some of the new corporate structures,[13] it neither disavowed nor endorsed the Comptroller’s position on national bank ownership of operating subsidiaries. Notwithstanding the congressional silence, in 1996 the OCC once again attempted to expand national banks’ ownership powers. The agency issued a regulation permitting national bank operating subsidiaries to undertake activities that the bank was not allowed to engage in directly. 12 CFR §§ 5.34(d), (f) (1997) (authorizing national banks to “acquire or establish an operating subsidiary to engage in [activities] different from that permissible for the parent national bank,” so long as those activities are "part of or incidental to the business of banking, as determined by the Comptroller of the Currency”); see also 61 Fed. Reg. 60342 (1996).
Congress overruled this OCC regulation in 1999 in the Gramm-Leach-Bliley Act (GLBA), 113 Stat. 1338. The GLBA was a seminal piece of banking legislation inasmuch as it repealed the Glass-Steagall Act’s ban on affiliations between commercial and investment banks. See § 101, id., at 1341. More relevant to this case, however, the GLBA addressed the powers of national banks to owm subsidiary corporations. The Act provided that any national bank subsid *30 iary engaging in activities forbidden to the parent bank would be considered a “financial subsidiary,” §121, id., at 1380, and would be subjected to heightened regulatory obligations, see, e.g., 12 U. S. C. § 371c-l(a)(l). The GLBA’s definition of “financial subsidiaries” excluded those subsidiaries that “engag[e] solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks.” §24a(g)(3).
By negative implication, then, only subsidiaries engaging in purely national bank activities — which the OCC had termed “operating subsidiaries,” but which the GLBA never mentions by name — could avoid being subjected to the restrictions that applied to financial subsidiaries. Compare §371c(b)(2) (exempting subsidiaries from certain regulatory restrictions) with §371e(e) (clarifying that financial subsidiaries are not to be treated as “subsidiaries”). Taken together, these provisions worked a rejection of the OCC’s position that an operating subsidiary could engage in activities that national banks could not engage in directly.[14] See § 24a(g)(3). Apart from this implicit rejection of the OCC’s 1996 regulation, however, the GLBA does not even mention operating subsidiaries.
In sum, Congress itself has never authorized national banks to use subsidiaries incorporated under state law to perform traditional banking functions. Nor has it authorized the OCC to “license” any state-chartered entity to do so. The fact that it may have acquiesced in the OCC’s expansive *31 interpretation of its authority is a plainly insufficient basis for finding pre-emption.
Ill
It is familiar learning that “[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis.” Cipollone v. Liggett Group, Inc., 505 U. S. 504, 516 (1992) (internal quotation marks omitted). In divining that congressional purpose, I would have hoped that the Court would hew both to the NBA’s text and to the basic rule, central to our federal system, that “[i]n all pre-emption cases ... we ‘start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.’” Medtronic, Inc. v. Lohr, 518 U. S. 470, 485 (1996) (quoting Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230 (1947)). Had it done so, it could have avoided the untenable conclusion that Congress meant the NBA to pre-empt the state laws at issue here.
The NBA in fact evinces quite the opposite congressional purpose. It provides in 12 U. S. C. § 484(a) that “[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law.” Although this exemption from state visitorial authority has been in place for more than 140 years, see §54, 13 Stat. 116 (national banks “shall not be subject to any other visitorial powers than such as are authorized by this act”), it is significant that Congress has never extended 12 U. S. C. §484(a)’s pre-emptive blanket to cover national bank subsidiaries.
This is not, contrary to the Court’s suggestion, see ante, at 19-20, some kind of oversight. As the complex history of the banking laws demonstrates, Congress has legislated extensively with respect to national bank “affiliates” — an operating subsidiary is one type of affiliate[15] — and has more *32 over given the OCC extensive supervisory powers over those affiliates, see § 481 (providing that a federal examiner “shall have power to make a thorough examination of all the affairs of [a national bank] affiliate, and in doing so he shall have power... to make a report of his findings to the Comptroller of the Currency”). That Congress lavished such attention on national bank affiliates and conferred such far-reaching authority on the OCC without ever expanding the scope of § 484(a) speaks volumes about Congress’ preemptive intent, or rather its lack thereof. Consistent with our presumption against pre-emption — a presumption I do not understand the Court to reject — I would read § 484(a) to reflect Congress’ considered judgment not to pre-empt the application of state visitorial laws to national bank “affiliates.”
Instead, the Court likens § 484(a) to a congressional afterthought, musing that it merely “[r]ecogniz[es] the burdens and undue duplication state controls could produce.” Ante, at 14. By that logic, I take it the Court believes that the NBA would impliedly pre-empt all state visitorial laws as applied to national banks even if §484(a) did not exist. That is surprising and unlikely. Not only would it reduce the NBA’s express pre-emption provision to so much surplus-age, but it would give Congress’ silence greater statutory dignity than an express command. Perhaps that explains why none of the four Circuits to have addressed this issue relied on the pre-emptive force of the NBA itself. Each instead asked whether the OCC’s regulations pre-empted state laws.[16] Stranger still, the Court’s reasoning would suggest *33 that operating subsidiaries have been exempted from state visitorial authority from the moment the OCC first authorized them in 1966. See 31 Fed. Reg. 11459. Yet if that were true, surely at some point over the last 40 years some national bank would have gone to court to spare its subsidiaries from the yoke of state regulation; national banks are neither heedless of their rights nor shy of litigation. But respondents point us to no such cases that predate the OCC’s pre-emption regulations.
The Court licenses itself to ignore §484(a)’s limits by reasoning that “when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State’s regulations must give way.” Ante, at 12. But it intones this “significant impairment” refrain without remembering that it merely provides a useful tool — not the only tool, and not even the best tool — to discover congressional intent. As we explained in Barnett Bank, this Court “take[s] the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted.” 517 U. S., at 33 (emphasis added). But any assumption about what Congress “normally” wants is of little moment when Congress has said exactly what it wants.
The Court also puts great weight on Barnett Bank’s reference to our “history ... of interpreting grants of both enumerated and incidental ‘powers’ to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law.” Id., at 32. The Court neglects to mention that Barnett Bank is quite clear that this interpretive rule applies only when Congress has failed (as it often does) to manifest an explicit pre-emptive intent. Id., at 31. “In that event, courts must consider whether the federal statute’s ‘structure and purpose,’ or nonspecific statutory language, nonetheless reveal a clear, but implicit, preemptive intent.” Ibid, (emphasis added). Barnett Bank *34 nowhere holds that we can ignore strong indicia of congressional intent whenever a state law arguably trenches on national bank powers. After all, the case emphasized that the question of pre-emption “is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?” Id., at 30. The answer here is a resounding no.
Even if it were appropriate to delve into the significant impairment question, the history of this very case confirms that neither the Mortgage Brokers, Lenders, and Servicers Licensing Act, Mich. Comp. Laws Ann. §445.1651 et seq. (West 2002 and Supp. 2006), nor the Secondary Mortgage Loan Act, § 493.51 et seq. (West 2005), conflicts with “the letter or the general objects and purposes of Congressional legislation.” Davis v. Elmira Savings Bank, 161 U. S. 275, 290 (1896). Enacted to protect consumers from mortgage lending abuses, the Acts require mortgage brokers, mortgage servicers, and mortgage lenders to register with the State, §§445.1652(1) (West Supp. 2006), 493.52(1) (West 2005), to submit certain financial statements, §§445.1657(2) (West 2002), 493.56a(2) (West 2005), and to submit to state visitorial oversight, §§ 445.1661 (West 2002), 493.56b (West 2005). Because the Acts expressly provide that they do not apply to “depository financial institution[s],” § 445.1675(a) (West 2002), neither national nor state banks are covered.[17] The statute therefore covers only nonbank companies incorporated under state law.[18]
*35 Respondent Wachovia Mortgage Corporation has never engaged in the core banking business of accepting deposits. In 1997, when Wachovia Mortgage was first licensed to do business in Michigan, it was owned by a holding company that also owned the respondent Wachovia Bank, N. A. (Neither the holding company nor the bank did business in Michigan.) There is no evidence, and no reason to believe, that compliance with the Michigan statutes imposed any special burdens on Wachovia Mortgage’s activities, or that the transfer in 2003 of its ownership from the holding company to the bank required it to make any changes whatsoever in its methods of doing business. Neither before nor after that transfer was there any discernible federal interest in granting the company immunity from regulations that applied evenhandedly to its competitors. The mere fact that its activities may also be performed by its banking parent provides at best a feeble justification for immunizing it from state regulation. And it is a justification that the longstanding congressional “policy of competitive equality” clearly outweighs. See Plant City, 396 U. S., at 133.
Again, however, it is beside the point whether in the Court’s judgment the Michigan laws will hamper national banks’ ability to carry out their banking functions through operating subsidiaries. It is Congress’ judgment that matters here, and Congress has in the NBA pre-empted only those laws purporting to lodge with state authorities visitorial power over national banks. 12 U. S. C. § 484(a). In my view, the Court’s eagerness to infuse congressional silence with pre-emptive force threatens the vitality of most state laws as applied to national banks — a result at odds with the long and unbroken history of dual state and federal authority over national banks, not to mention our federal system of government. It is especially troubling that the Court so blithely pre-empts Michigan laws designed to protect consumers. Consumer protection is quintessentially a “field *36 which the States have traditionally occupied,” Rice, 331 U. S., at 230;[19] the Court should therefore have been all the more reluctant to conclude that the “clear and manifest purpose of Congress” was to set aside the laws of a sovereign State, ibid.
IV
Respondents maintain that even if the NBA lacks preemptive force, the GLBA’s use of the phrase “same terms and conditions” reflects a congressional intent to pre-empt state laws as they apply to the mortgage lending activities of operating subsidiaries. See 12 U. S. C. §24a(g)(3). Indeed, the Court obliquely suggests as much, salting its analysis of the NBA with references to the GLBA. See ante, at 18, 19-20. Even a cursory review of the GLBA’s text shows that it cannot bear the pre-emptive weight respondents (and perhaps the Court) would assign to it.
The phrase “same terms and conditions” appears in the definition of “financial subsidiary,” not in a provision of the statute conferring national bank powers. Even there, it serves only to describe what a financial subsidiary is not. See § 24a(g)(3) (defining financial subsidiary as any subsidiary “other than a subsidiary that... engages solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks”). Apart from this slanting reference, the GLBA never mentions operating subsidiaries. Far from a demonstration that the “clear and manifest purpose of Congress” was to pre-empt the type of law at issue here, Rice, 331 U. S., at 230, the “same terms and conditions” language at most reflects an uncontroversial acknowledgment that operating subsidiaries of national banks are subject to the same federal *37 oversight as their national bank parents.[20] It has nothing to do with pre-emption.
Congress in fact disavowed any such pre-emptive intent. Section 104 of the GLBA is titled “Operation of State Law,” 113 Stat. 1352, and it devotes more than 3,000 words to explaining which state laws Congress meant the GLBA to preempt. Leave aside the oddity of a Congress that addresses pre-emption in exquisite detail in one provision of the GLBA but (according to respondents) uses only four words to express a pre-emptive intent elsewhere in the statute. More importantly, § 104(d)(4) provides that u[n]o State statute .. . shall be preempted” by the GLBA unless that statute has a disparate impact on federally chartered depository institutions, “prevent[s] a depository institution or affiliate thereof from engaging in activities authorized or permitted by this Act,” or “eonflict[s] with the intent of this Act generally to permit affiliations that are authorized or permitted by Federal law.” Id., at 1357 (emphasis added) (codified at 15 U. S. C. § 6701(d)(4)). No one claims that the Michigan laws at issue here are discriminatory, forbid affiliations, or “prevent” any operating subsidiary from engaging in banking activities. It necessarily follows that the GLBA does not pre-empt them.
Even assuming that the phrase has something to do with pre-emption, it is simply not the case that the nonencroachment of state regulation is a “term and condition” of engagement in the business of banking. As a historical matter, state laws have always applied to national banks and have often encroached on the business of banking. See National Bank, 9 Wall., at 362 (observing that national banks “are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation”). The Court itself acknowledges that state usury, contract, and property law govern the activities of *38 national banks and their subsidiaries, ante, at 11-12, notwithstanding that they vary across “all States in which the banks operate,” ante, at 13. State law has always provided the legal backdrop against which national banks make real estate loans, and “[t]he fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive.” United States v. Philadelphia Nat. Bank, 374 U. S. 321, 352 (1963).
V
In my view, the most pressing questions in this case are whether Congress has delegated to the Comptroller of the Currency the authority to pre-empt the laws of a sovereign State as they apply to operating subsidiaries, and if so, whether that authority was properly exercised here. See 12 CFR §7.4006 (2006) (“State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank”). Without directly answering either question, the Court concludes that preemption is the “necessary consequence” of various congressional statutes. Ante, at 20. Because I read those statutes differently, I must consider (as did the four Circuits to have addressed this issue) whether an administrative agency can assume the power to displace the duly enacted laws of a state legislature.
To begin with, Congress knows how to authorize executive agencies to pre-empt state laws.[21] It has not done so here. *39 Nor does the statutory provision authorizing banks to engage in certain lines of business that are “incidental” to their primary business of accepting and managing the funds of depositors expressly or implicitly grant the OCC the power to immunize banks or their subsidiaries from state regulation.[22] See 12 U. S. C. § 24 Seventh. For there is a vast and obvious difference between rules authorizing or regulating conduct and rules granting immunity from regulation. The Comptroller may well have the authority to decide whether the activities of a mortgage broker, a real estate broker, or a travel agent should be characterized as “incidental” to banking, and to approve a bank’s entry into those businesses, either directly or through its subsidiaries. See, e. g., NationsBank of N. C., N. A. v. Variable Annuity Life Ins. Co., 513 U. S. 251, 258 (1995) (upholding the OCC’s interpretation of the “incidental powers” provision to permit national banks to serve as agents in annuity sales). But that lesser power does not imply the far greater power to immunize banks or their subsidiaries from state laws regulating the conduct of their competitors.[23] As we said almost 40 years ago, “the *40 congressional policy of competitive equality with its deference to state standards” is not “open to modification by the Comptroller of the Currency.” Plant City, 396 U. S., at 138.[24]
Were I inclined to assume (and I am not) that congressional silence should be read as a conferral of pre-emptive authority, I would not find that the OCC has actually exercised any such authority here. When the agency promulgated 12 CFR §7.4006, it explained that “[t)he section itself does not effect preemption of any State law; it reflects the conclusion we believe a Federal court would reach, even in the absence of the regulation . . . .” 66 Fed. Reg. 34790 (2001) (emphasis added). Taking the OCC at its word, then, § 7.4006 has no pre-emptive force of its own, but merely predicts how a federal court’s analysis will proceed.
*41 Even if the OCC did intend its regulation to pre-empt the state laws at issue here, it would still not merit Chevron deference. No case from this Court has ever applied such a deferential standard to an agency decision that could so easily disrupt the federal-state balance. To be sure, expert agency opinions as to which state laws conflict with a federal statute may be entitled to “some weight,” especially when “the subject matter is technical” and “the relevant history and background are complex and extensive.” Geier v. American Honda Motor Co., 529 U. S. 861, 883 (2000). But “[u]nlike Congress, administrative agencies are clearly not designed to represent the interests of States, yet with relative ease they can promulgate comprehensive and detailed regulations that have broad pre-emption ramifications for state law.” Id., at 908 (Stevens, J., dissenting).[25] For that reason, when an agency purports to decide the scope of federal pre-emption, a healthy respect for state sovereignty calls for something less than Chevron deference. See 529 U. S., at 911-912; see also Medtronic, 518 U. S., at 512 (O’Connor, J., concurring in part and dissenting in part) (“It is not certain that an agency regulation determining the pre-emptive effect of any federal statute is entitled to deference”).
In any event, neither of the two. justifications the OCC advanced when it promulgated 12 CFR §7.4006 withstand Chevron analysis. First, the OCC observed that the GLBA “expressly acknowledged the authority of national banks to own subsidiaries” that conduct national bank activities “ ‘subject to the same terms and conditions that govern the conduct of such activities by national banks.’” 66 Fed. Reg. 34788 (quoting 12 U. S. C. § 24a(g)(3)). The agency also noted that it had folded the “ ‘same terms and conditions’ ” language into an implementing regulation, 66 Fed. Reg. *42 34788 (citing 12 CFR § 5.34(e)(3) (2001)). According to the OCC, “[a] fundamental component of these descriptions of the characteristics of operating subsidiaries in GLBA and the OCC’s rule is that state laws apply to operating subsidiaries to the same extent as they apply to the parent national bank.” 66 Fed. Reg. 34788.
This is incorrect. As explained above, the GLBA's offhand use of the “same terms and conditions” language says nothing about pre-emption. See supra, at 36-38. Nor can the OCC’s incorporation of that language into a regulation support the agency’s position: “Simply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute.” Gonzales v. Oregon, 546 U. S. 243, 257 (2006). The OCC’s argument to the contrary is particularly surprising given that when it promulgated its “same terms and conditions” regulation, it said not one word about pre-emption or the federalism implications of its rule — an inexplicable elision if a “fundamental component” of the phrase is the need to operate unfettered by state oversight. Compare 65 Fed. Reg. 12905-12910 (2000) with Exec. Order No. 13132, §§ 2,4,64 Fed. Reg. 43255,43257 (1999) (requiring agencies to explicitly consider the “federalism implications” of their chosen policies and to hesitate before pre-empting state laws).
Second, the OCC describes operating subsidiaries “as the equivalent of departments or divisions of their parent banks,” 66 Fed. Reg. 34788, which, through the operation of 12 U. S. C. § 484(a), would not be subject to state visitorial powers. The OCC claims that national banks might desire to conduct their business through operating subsidiaries for the purposes of “controlling operations costs, improving effectiveness of supervision, more accurate determination of profits, decentralizing management decisions [and] separating particular operations of the bank from other operations.” Brief for United States as Amicus Curiae 19 (quoting 31 *43 Fed. Reg. 11460). It is obvious, however, that a national bank could realize all of those benefits through the straightforward expedient of dissolving the corporation and making it in fact a “department” or a “division” of the parent bank.
Rather, the primary advantage of maintaining an operating subsidiary as a separate corporation is that it shields the national bank from the operating subsidiaries’ liabilities. United States v. Bestfoods, 524 U. S. 51, 61 (1998) (“It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiary” (internal quotation marks omitted)). For that reason, the OCC’s regulation is about far more than mere “corporate structure,” ante, at 18, or “internal governance,” ante, at 21, 19 (citing Wells Fargo Bank N. A. v. Boutris, 419 F. 3d 949, 960 (CA9 2005)); see also Dole Food Co. v. Patrickson, 538 U. S. 468, 474 (2003) (“In issues of corporate law structure often matters”). It is about whether a state corporation can avoid complying with state regulations, yet nevertheless take advantage of state laws insulating its owners from liability. The federal interest in protecting depositors in national banks from their subsidiaries’ liabilities surely does not justify a grant of immunity from laws that apply to competitors. Indeed, the OCC’s regulation may drive companies seeking refuge from state regulation into the arms of federal parents, harm those state competitors who are not lucky enough to find a federal benefactor, and hamstring States’ ability to regulate the affairs of state corporations. As a result, the OCC’s regulation . threatens both the dual banking system and the principle of competitive equality that is its cornerstone.
VI
The novelty of today’s holding merits a final comment. Whatever the Court says, this is a case about an administrative agency’s power to pre-empt state laws. I agree with the Court that the Tenth Amendment does not preclude the *44 exercise of that power. But the fact that that Amendment was included in the Bill of Rights should nevertheless remind the Court that its ruling affects the allocation of powers among sovereigns. Indeed, the reasons for adopting that Amendment are precisely those that undergird the well-established presumption against pre-emption.
With rare exception, we have found pre-emption only when a federal statute commanded it, see Cipollone, 505 U. S., at 517, when a conflict between federal and state law precluded obedience to both sovereigns, see Florida Lime & Avocado Growers, Inc. v. Paul, 373 U. S. 132, 142-143 (1963), or when a federal statute so completely occupied a field that it left no room for additional state regulation, see Napier v. Atlantic Coast Line R. Co., 272 U. S. 605, 613 (1926). Almost invariably the finding of pre-emption has been based on this Court’s interpretation of statutory language or of regulations plainly authorized by Congress. Never before have we endorsed administrative action whose sole purpose was to pre-empt state law rather than to implement a statutory command.
Accordingly, I respectfully dissent.

 “There is no more characteristic difference between the state and the national banking laws than the fact that almost without exception, state banks may loan on real estate security, while national banks are prohibited from doing so.” G. Barnett, State Banking in the United States Since the Passage of the National Bank Act 50 (1902) (reprint 1983) (hereinafter Barnett).

 B. Hammond, Banks and Politics in America: from the Revolution to the Civil War 728 (1957).

 Id,., at 733. See also Barnett 73-74 (estimating that more than 800 state banks were in operation in 1877, and noting the “remarkable increase in the number of state banks” during the last two decades of the 19th century).

 See also McClellan v. Chipman, 164 U. S. 347, 357 (1896) (explaining that our cases establish “a rule and an exception, the rule being the operation of general state laws upon the dealings and contracts of national banks, the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge the duties imposed upon them by the law of the United States”).

 See also Anderson Nat. Bank v. Luckett, 321 U. S. 233, 248 (1944) (“This Court has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks’ functions”); Davis v. Elmira Savings Bank, 161 U. S. 275, 290 (1896) (“Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not *25 conflict with the letter or the general objects and purposes of Congressional legislation”).

 See Scott, The Dual Banking System: A Model of Competition in Regulation, 30 Stan. L. Rev. 1, 8-13 (1978) (explaining the perceived benefits of the dual banking system).

 See also First Nat. Bank of Logan v. Walker Bank & Trust Co., 385 U. S. 252, 261 (1966) (observing that in passing the McFadden Act, “Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864”).

 What has emerged are “two interrelated systems in which most state-chartered banks are subject to varying degrees of federal regulation, and where state laws are made applicable, to a varying extent, to federally-chartered institutions.” 1 A. Graham, Banking Law § 1.04, p. 1-12 (Nov. 2006).

 It is noteworthy that the principal cases that the Court cites to support its conclusion that the federal statute itself pre-empts the Michigan laws were decided years before Congress authorized national banks to engage in mortgage lending and years before the Office of the Comptroller of the Currency (OCC) authorized their use of operating subsidiaries. See ante, at 11-12,14.

 In Investment Company Institute v. Camp, 401 U. S. 617 (1971), we set aside a regulation issued by the Comptroller of the Currency authorizing banks to operate collective investment funds because that activity was prohibited by the Glass-Steagall Act. Similarly, in Securities Industry Assn. v. Board of Governors, FRS, 468 U. S. 137 (1984), the Glass-Steagall Act provided the basis for invalidating a regulation authorizing banks to enter the business of selling third-party commercial paper.

 See J. Macey, G. Miller, & R. Camell, Banking Law and Regulation 21 (3d ed. 2001) (describing “the alleged misdeeds of the large banks’ securities affiliates and the ways in which such affiliations could promote unsound lending, irresponsible speculation, and conflicts of interest”).

 See 31 Fed. Reg. 11459 (1966).

 See Bank Holding Company Act of 1956, 70 Stat. 133; Bank Holding Company Act Amendments of 1970, 84 Stat. 1760.

 While the statutory text provides ample support for this conclusion, it is noteworthy that it was so understood by contemporary commentators. See, e. g., 145 Cong. Rec. 29681 (1999) (“Recently, the Comptroller of the Currency has interpreted section 24 (Seventh) of the National Bank Act to permit national banks to own and control subsidiaries engaged in activities that national banks cannot conduct directly. These decisions and the legal reasoning therein are erroneous and contrary to the law. The [GLBA] overturns these decisions ...” (statement of Representative Bliley)).

 See 12 U. S. C. § 221a(b) (defining affiliates to include “any corporation” that a federal member bank owns or controls).

 See National City Bank of Indiana v. Turnbaugh, 463 F. 3d 325, 331-334 (CA4 2006) (holding that state law conflicted with the OCC regulations, not with the NBA); Wachovia Bank, N. A. v. Burke, 414 F. 3d 305, 315-316 (CA2 2005) (same); 431 F. 3d 556, 560-568 (CA6 2005) (case below) (same); Wells Fargo Bank N. A. v. Boutris, 419 F. 3d 949, 962-967 (CA9 2005) (same).

 While the Court at one point observes that “the Michigan provisions at issue exempt national banks from coverage,” see ante, at 13, that is because they are “banks,” not because they are “national.” See ante, at 8 (noting that “Michigan’s statutory regime exempts banks, both national and state, from state mortgage lending regulation” (emphasis added)).

 The Michigan laws focus on consumer protection, whereas the OCC regulations quoted by the Court focus on protection of bank depositors. See ante, at 12, n. 4, and 16, n. 8.

 See also General Motors Corp. v. Abrams, 897 F. 2d 34, 41-43 (CA2 1990) (“Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area”).

 See 31 Fed. Reg. 11460 (noting that the OCC maintains regulatory oversight of operating subsidiaries).

 See, e. g., 47 U. S. C. §§ 253(a), (d) (authorizing the Federal Communications Commission to pre-empt "any [state] statute, regulation, or legal requirement” that “may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service”); 30 U. S. C. § 1254(g) (pre-empting any statute that conflicts with “the purposes and the requirements of this chapter” and permitting the Secretary of the Interior to “set forth any State law or regulation which is preempted and superseded”); 49 U. S. C. § 5125(d) (authorizing the *39 Secretary of Transportation to decide whether a state or local statute that conflicts with the regulation of hazardous waste transportation is pre-empted).

 Congress did make an indirect reference to regulatory pre-emption in the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, § 114,108 Stat. 2367 (codified at 12 U. S. C. § 43(a)). The Riegle-Neal Act requires the OCC to jump through additional procedural hoops (specifically, notice and comment, even for opinion letters and interpretive rules) before “conclud[ing] that Federal law preempts the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending, or the establishment of intrastate branches.” Ibid. By its own terms, however, this provision granted no pre-emption authority to the OCC.

 In a recent adoption of a separate pre-emption regulation, the OCC located the source of its authority to displace state laws in §§93a and 371. See 69 Fed. Reg. 1908 (2004). Both provisions are generic authorizations of rulemaking authority, however, and neither says a word about preemption. See 12 U. S. C. § 93a (“[T]he Comptroller of the Currency is au *40 thorized to prescribe rules and regulations to carry out the responsibilities of the office”); § 371(a) (authorizing national banks to make real estate loans “subject to ... such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order”). Needless to say, they provide no textual foundation for the OCC’s assertion of preemption authority.

 This conclusion does not touch our eases holding that a properly promulgated agency regulation can have a pre-emptive effect should it conflict with state law. See Hillsborough County v. Automated Medical Laboratories, Inc., 471 U. S. 707, 713 (1985) (“We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes”); see also Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta, 458 U. S. 141, 154-159 (1982) (holding that a regulation authorizing federal savings-and-loan associations to include due-on-sale clauses in mortgage contracts conflicted with a state-court doctrine that such clauses were unenforceable); City of New York v. FCC, 486 U. S. 57, 59, 65-70 (1988) (finding that the FCC’s adoption of “regulations that establish technical standards to govern the quality of cable television signals” pre-empted local signal quality standards). My analysis is rather confined to agency regulations (like the one at issue here) that “purpor[t] to settle the scope of federal preemption” and “reflec[t] an agency’s effort to transform the preemption question from a judicial inquiry into an administrative fait accompli.” See Note, The Unwarranted Regulatory Preemption of Predatory Lending Laws, 79 N. Y. U. L. Rev. 2274, 2289 (2004).

 See also Mendelson, Chevron and Preemption, 102 Mich. L. Rev. 737, 779-790 (2003-2004) (arguing that agencies are generally insensitive to federalism concerns).